GATES v VOLKSWAGENWERK AKTIENGESELLSCHAFT

Docket No. 66413. Submitted August 26, 1982, at Lansing.—Decided December 20, 1982. Leave to appeal applied for.

    Ida Gates, administratrix of the estate of Willis L. Gates, deceased, D. L. Brown, and Mary E. Brown, brought suit in Wayne Circuit Court against Volkswagenwerk Aktiengesellschaft, Volkswagen of America, Inc., and Melton Motors, Inc., based on products liability. Plaintiff Gates's decedent was killed and D. L. Brown was injured in an automobile accident in which the Volkswagen bus in which they were riding hit a guardrail and tilted over on its side. The court, Michael J. Talbot, J., entered judgment for the defendants on a directed verdict following the presentation of the plaintiffs' proofs and subsequently denied the plaintiffs' motion for a new trial. The plaintiffs appealed. The Court of Appeals, in an unpublished opinion, Docket No. 49525, affirmed the trial court's order denying the plaintiffs' motion for a new trial. The Michigan Supreme Court, in lieu of granting plaintiffs leave to appeal, reversed the judgment of the Court of Appeals and remanded the case to the Court of Appeals for plenary consideration of the allegations of error addressed to the trial court's direction of a verdict for the defendants following the presentation of plaintiffs' proofs. 414 Mich 901 (1982). *Held:*

    A trial court in deciding whether to grant a motion for a directed verdict should deny the motion if the evidence presented establishes a prima facie case. To present a prima facie case in a products liability action a plaintiff needs to present evidence: (1) of a defect, (2) of a causal connection between the defect and the accident, and (3) that the defect is attributable to the defendants. The plaintiffs presented sufficient evidence that the van's steering damper was defective. Sufficient evi-

REFERENCES FOR POINTS IN HEADNOTES

[1] 58 Am Jur 2d, New Trial §§ 212, 213.

What standards govern appellate review of trial court's conditional ruling pursuant to Rule 50(c)(1) of Federal Rules of Civil Procedure on party's motion for new trial. 52 ALR Fed 494.

[2] 75 Am Jur 2d, Trial § 469 *et seq.*

[3] 75 Am Jur 2d, Trial §§ 483, 484.

dence was presented to demonstrate a causal connection between the defect and the accident. The plaintiffs failed to introduce evidence linking one, the other, or both of the Volkswagen manufacturers to the van and damper. The trial court did not err in directing a verdict for the Volkswagen manufacturers. The plaintiffs did establish a prima facie case against Melton Motors because evidence was presented that the van was purchased from Melton Motors. A directed verdict should not have been granted in favor of Melton Motors.

Affirmed in part, reversed in part, and remanded.

1. MOTIONS AND ORDERS — NEW TRIAL.

The grant or denial of a motion for a new trial is within the sound discretion of the trial court which, if not abused, should not be interfered with on appeal (GCR 1963, 527.1).

2. MOTIONS AND ORDERS — DIRECTED VERDICT.

The jury, not the judge, is the trier of fact in a trial by jury; a trial judge, in deciding whether to grant a motion for a directed verdict in a trial by jury, should view the evidence and all legitimate inferences that may be drawn therefrom in a light most favorable to the non-moving party and when so viewed, if the evidence establishes a prima facie case, the motion should be denied.

3. PRODUCTS LIABILITY — DIRECTED VERDICT.

A plaintiff in a products liability case, in order to withstand a motion for a directed verdict for the defendant, must produce evidence which shows: (1) a defect, (2) a causal connection between the defect and the plaintiff's injuries, and (3) that the defect is attributable to the defendant.

*Rifkin, Kingsley & Rhodes, P.C.* (by *Frank K. Rhodes, III),* for plaintiffs.

*Miller, Canfield, Paddock & Stone* (by *Wolfgang Hoppe, Clarence L. Pozza, Jr.,* and *Larry J. Saylor),* for defendants.

Before: R. M. MAHER, P.J., and R. B. BURNS and M. J. KELLY, JJ.

M. J. KELLY, J. We revisit this appeal by order of the Supreme Court dated August 24, 1982, 414

Mich 901 (1982), which reversed our previous unpublished opinion affirming the trial court's denial of a motion for a new trial. The Supreme Court order notes that:

"Any failure to complete the record on appeal in respect to the proceedings on the motion for new trial did not justify dismissal of the appeal."

The Supreme Court's order then approves the use of a motion for new trial, however perfunctory, to preserve claimed errors committed during trial and neither briefed, argued, or recorded as grounds in support of motion for a new trial.

This is a products liability action arising out of an automobile accident in which plaintiff Ida Gates's decedent, Willie Lee Gates, was killed and plaintiff D. L. Brown was injured. Following plaintiffs' presentation of proofs at trial, the trial court granted a directed verdict in favor of defendants. Judgment was entered on March 16, 1979. Plaintiffs filed a timely motion for a new trial. Plaintiffs' motion did not delineate the grounds upon which they were seeking a new trial and their brief in support of their motion consisted only of one sentence, in which they stated they would "rely on GCR 1963, 527.1(1), (5) and (7) in support of motion for new trial". This motion was denied at an April 19, 1979 hearing. A written order dated April 19, 1979, denying the motion for a new trial is contained in the circuit court file. Although no subsequent motion for a new trial was made, a second order, dated January 7, 1980, is also contained in the circuit court file. On January 23, 1980, plaintiffs claimed an appeal as of right "from the order denying plaintiffs' motion for new trial entered on the 7th day of January, 1980".

The grant or denial of a motion for a new trial

is within the sound discretion of the trial court which, if not abused, cannot be interfered with on appeal. *Kailimai v Firestone Tire & Rubber Co,* 398 Mich 230, 232; 247 NW2d 295 (1976). Thus, on June 8, 1981, this Court, in an unpublished opinion, affirmed the trial court's denial of plaintiffs' motion for a new trial. We noted that:

"the substance of plaintiffs' motion is not clear from the motion itself, the 'briefs' concerning the motion, or the trial court's order denying the motion. In addition, plaintiffs failed to present this Court with a transcript of the oral argument on the motion which might have clarified the issues presented. As was noted in *[Lemanski v Ford Motor Co,* 82 Mich App 244; 266 NW2d 775 (1978), *lv den* 450 Mich 811 (1979)], the requirement is that there be not only form but also substance to the motion for a new trial for it is only on the substance contained in the presentation of the motion that this Court can test whether the trial court in its disposition of the motion abused its discretion to the point that reversal of the trial court is required." *Gates v Volkswagenwerk Aktiengesellschaft* (Docket No 49525, decided June 8, 1981).

Plaintiffs subsequently applied for leave to appeal to the Supreme Court. In lieu of granting leave, the Court reversed and remanded the case in an order "for plenary consideration of the assignments of error addressed to the trial judge's direction of a verdict following the conclusion of plaintiff's proofs". *Gates v Volkswagenwerk Aktiengesellschaft,* 414 Mich 901 (1982).

The Supreme Court's perfunctory order requires us to do more than determine whether the trial court abused its discretion in denying plaintiffs' motion for a new trial. It directs us to determine the propriety of the trial court's original grant of a directed verdict.

At trial, the deposition of plaintiff D. L. Brown was read into evidence. In his deposition, Brown testified that he accompanied decedent Gates on a trip in his Volkswagen bus from Detroit to Alabama and back. On the way to Alabama, between Toledo and Cincinnati, the bus took a "sharp dip" to the left and almost went across the road before Gates could get the vehicle under control. Subsequently, the vehicle took several more dips. Gates had to "fight it to get it back under control". On the return trip, the road was dry, there was no snow or ice. Although the posted speed limit was 70 miles per hour, Gates was driving the Volkswagen at approximately 55 miles per hour. Brown heard a "pop". Brown looked at Gates, who was trying to control the steering wheel. Brown described Gates as "wrestling" and "struggling" with the steering wheel. The bus tilted over on its left side. Brown was injured and Gates was killed.

Taylor Police Lieutenant Robert Harshberger was called to the scene of the accident. He testified that it appeared that the bus had hit a guardrail about 60 feet south of where the bus finally came to a stop. Harshberger described the driving conditions at the time of the accident as extremely hazardous. A sheet of ice covered the road. Other vehicles were having problems staying on the road.

Taylor Police Officer Thomas Moore arrived at the scene of the accident with Harshberger. He testified that the road conditions were icy. Two or three other cars lost control at the scene while he was there, although none of those occurrences resulted in a serious accident.

Jack Campau, a mechanical engineer, testified that sometime after the accident he examined the bus at a car dealership. It had an odometer read-

ing of 21,609.7. The steering wheel "felt normal". His inspection of the vehicle found everything to be normal, with the exception of the right rear shock absorber which looked to be "rubbing". Campau next examined and took notes regarding the accident site.

The bus was subsequently towed from the dealership to a service station and lifted onto a hoist. There, Campau noticed that the steering damper on the steering linkage was broken. According to Campau, a steering damper tends to act as a shock absorber and dampen any wheel oscillations. Plaintiffs' exhibit "R" was received into evidence. It was a steering damper purchased at a Volkswagen dealer as a replacement part for the bus. According to Campau, the exhibit physically, on the outside, looked the same as the damper on the Volkswagen. (The original damper was found by the trial court to have been lost through no fault of either party.) Campau found that the vehicle's wheels could be turned further to the right than they could be turned to the left. Campau testified that after careful examination of the steering damper, he

"could see that one tube had broken all the way around. I would see there was a dent in the smaller end. I could see there were some gouges in the piston on the inside. And other than that, I made no notice of anything of any importance."

Campau testified further that Volkswagens are the only vehicles he knows of which have steering dampers. The dampers do not require any servicing. Campau specifically opined that the bus's "steering damper failed, permitting an oscillation that caused a loss of control, and subsequently, the collision". He reasoned that oscillations can be

caused by a number of contributing factors, such as road condition, speed, wind, road curvature, and wheel imbalance. With the failure of the damper and the right combination of conditions existing to result in an oscillation, there would be "no damper to dampen it". Campau opined further that:

"There were a number of contributing factors, but the one factor that was present that would have, in my opinion, eliminated the loss of control was the steering damper. The loss of the steering damper was the one item that resulted in the loss of control because it had failed. It if hadn't failed, the presence of all the other factors probably wouldn't have resulted in loss of control."

He added that he "didn't find any other possible loss of control".

When asked how the damper could have broken, Campau gave two possible explanations: a fatigue failure which resulted in a gradual failure and eventual separation or from some direct impact to the damper. An impact failure would not result from something hitting the vehicle but rather from "the bus going through a chuckhole or something like that". He added, however, that a sound damper would not have broken by the wheel hitting a chuckhole. Campau's opinion was that the damper broke because of fatigue failure. Although Campau could not be sure whether the damper broke several days before the accident or at the time of the accident, he was certain that the damper broke "before loss of control". Campau's opinion was that the damper was "defective in design".

The deposition of mechanical and metallurgical engineer Charles Smith was read into evidence. He testified that he examined the failed damper from

the Volkswagen bus along with the replacement damper. He opined that the damper could have failed either due to fatigue or due to impact. He testified that he leaned "toward the view that a fatigue failure might be somewhat more likely". He noted that "there is a stress concentration located in a region of reduced wall thickness which makes it highly susceptible to failure at that point". In Smith's opinion, it was bad designing to have the reduced wall section in light of the stress concentration. Smith did not have enough information, however, to comment on whether the damper was capable of withstanding expectable stresses.

The deposition of truck driver Carl Welch, a witness to the accident, was read into evidence. He testified that the accident occurred early in the morning and that the road was very icy. The bus passed him at a speed of approximately 55 to 60 miles per hour before the accident. As the bus pulled in front of Welch, it lost control. Instead of straightening out, the vehicle headed for the guardrail, hit the guardrail, and flipped on its side.

Thomas Trombly came upon the accident shortly after it had occurred. He testified that the road was slick.

Plaintiff Ida Gates testified that her husband bought the Volkswagen bus from defendant Melton Motors in June of 1973. She never saw any damage to the Volkswagen before the accident.

Martin Peterson, a wrecker driver, was called to the scene of the accident. He proceeded to flip the bus back onto its wheels. Once the bus was upright, Peterson noticed a broken piece hanging down underneath the vehicle. Upon being shown photographs, Peterson pointed to the steering damper as being the broken piece.

Besides testimony concerning the injuries to

Willie Gates, D. L. Brown, and resulting damages to their families, the above concluded the presentation of plaintiffs' proofs. Defendants then moved for a directed verdict, which was granted by the trial court.

The court reasoned that plaintiffs failed to link the steering damper to any specific defendant. The court stated:

"There has been no showing, apparently by way of discovery depositions, that this German corporation has anything to do with the bus. Maybe there's a Volkswagen of America that simply distributes. I don't know who these people are. I can guess all day long but I don't know what the system was in 1973."

The court found also that the damper was not defective because the accident was not foreseeable:

"There has been no showing here that the defendants failed to use reasonable care in the manufacture to guard against unreasonable and foreseeable risk. Campau was never taken down the road to show that it was a foreseeable risk that this could occur. He says he doesn't even know quite how the damper works. He can speculate that it makes the riding nicer, and it may help in terms of oscillation. He indicates that in his own automobile he has oscillations on occasions, that all automobiles will have oscillations, there's no way to prevent oscillations. If a car is out of balance in terms of the wheels, you're going to have some oscillations. He can speculate that the damper on this Volkswagen was either used to make the ride nicer or to minimize oscillation. He suggests that there's an occurrence that one might never be able to duplicate again, a unique set of circumstances; therefore that takes it out of any possible realm of foreseeability.

"How do you design something, using reasonable care —even Smith suggests that if there will be a break, it will be a break at the weakest part in terms of the design of the item. That's as far as he'll go, and he says

it should be designed differently. He doesn't say that this is a bad and dangerous, inherently dangerous design, does he?

"*Mr. Rhodes [plaintiff's attorney]:* He says it right in the testimony. He says it's a bad design for this.

"*The Court:* He calls it a bad design.

"*Mr. Rhodes:* And he says it's bad for this or any other damper.

"*The Court:* That's right; it might break. But he certainly doesn't classify it as inherently dangerous because he doesn't even know what the damper does. He simply addresses himself to a metal design. That's not enough. If I'm designing in metal, I should design it differently. Is it inherently dangerous? He doesn't go into that. He doesn't know.

"I don't know how one is supposed to design an item against something that might never happen again and might never occur under any other circumstances. How do you design something like that?"

The court found also that plaintiffs presented inadequate proof of causation:

"I can't help but note Mr. Brown's testimony that there was trouble on the way down South. We'd have to speculate as to what those troubles might be. We didn't have, at least by Mr. Brown's statements, oscillation that Campau would describe. He talked about their taking a little dip, having trouble going across the road and keeping it under control. That's in Toledo and Cincinnati. Mr. Brown says that 'We'd have run off the road if he hadn't controlled it. It just dipped.' We don't know what that is. It certainly would be consistent with Campau's testimony that you've got an imbalance in the alignment. That's what he says happened to his car. This is certainly a situation where there are two or more possible causes, one of which the defendants— which defendant, I don't know—one of the defendants might be responsible for."

In a trial by jury, the jury, not the judge, is the

trier of fact. Thus, in deciding whether to grant a motion for a directed verdict, the trial court must view the evidence and all legitimate inferences that may be drawn therefrom in a light most favorable to the non-moving party. *Caldwell v Fox,* 394 Mich 401, 407; 231 NW2d 46 (1975). When so viewed, if the evidence establishes a prima facie case, the motion must be denied. *Caldwell, supra,* p 407.

To present a prima facie case, plaintiffs needed to present evidence: (1) of a defect, (2) of a causal connection between the defect and the accident, and (3) that the defect was attributable to defendants. See *Vanderberg v General Motors Corp,* 96 Mich App 683, 689; 293 NW2d 676 (1980); *Piercefield v Remington Arms Co, Inc,* 375 Mich 85, 98-99; 133 NW2d 129 (1965).

Plaintiffs presented sufficient evidence that the steering damper was defective. Peterson saw the broken damper at the scene of the accident. Campau found the steering damper broken. Campau opined that the damper broke due to fatigue. Smith agreed that fatigue was the more likely possible cause of the breakage. Even if the damper had broken due to some type of impact, however, such as hitting a chuckhole, Campau testified that a sound damper would not have broken under such circumstances. Common to each alternative is that the damper was defective. Whenever the damper broke, Campau was certain that it occurred "before loss of control". Smith added that it was a product of bad designing to have the damper's reduced wall section in light of the stress concentration. We find this evidence sufficient to raise a factual question for the jury as to whether the steering damper was defective.

Sufficient evidence was presented to demonstrate

a causal connection between the defect and the accident. Campau testified that the loss of the damper was a key factor leading to the decedent's loss of control of the bus. Campau "didn't find any other possible loss of control". Brown testified that the decedent was wrestling and struggling with the steering wheel. It would be reasonable to infer from this testimony that the defect in, and failure of, the steering damper caused the accident.

Finally, plaintiffs needed to present sufficient evidence tying the damper to defendants. The trial court's main problem with attributing the damper to the defendant manufacturers was that plaintiffs brought suit against two Volkswagen manufacturers without presenting evidence as to which of the two, if either, was responsible for the manufacture or installation of the damper. Not only did plaintiffs fail at the trial court level to introduce evidence linking one, the other, or both of the Volkswagen manufacturers to the damper, they have failed to do so on appeal as well. In attempting to attribute the vehicle to both manufacturers, plaintiffs cite this Court only to two interrogatory answers, which were *not* introduced into evidence at trial. The entire text of the interrogatory questions and answers are as follows:

*Plaintiffs' Question:* "State all steps of any inspections made of the steering damper of a 1973 Volkswagen Van during the process of manufacture and all tests made upon same prior to its being released and sold to the trade.

*Defendants' Answer:* "Defendants did not manufacture the steering damper installed in new 1973 Volkswagen Type II vehicles. The inspection procedures conducted by the manufacturer during the manufacturing process are not known to defendants. Upon purchase, units are inspected pursuant to quality controls, including various stroke and compression tests."

*Plaintiffs' Question:* "For a period of five (5) years prior to the date of the accident involved in this case, on or about the 18th day of January, 1974, how many steering dampers of the Volkswagen Van were either returned from the field, or returned to your duly authorized dealers throughout the United States who claimed that the same was defective?"

*Defendants' Answer:* "Defendants do not possess information of the nature described to enable them to respond to this inquiry. Further, objection is made in that the inquiry seeks information regarding 'claims' based on alleged defective steering dampers without relevance to similarity with the circumstances of the specific occurrence involved herein. The steering damper installed in the 1973 Volkswagen Type II vehicle was fit for its intended use without misuse."

The questions and answers do not tell us whether the particular defendants in this case manufactured or assembled the vehicle involved in the accident.

Plaintiffs' complaint alleged that defendant Volkswagen of America is a wholly owned subsidiary of Volkswagenwerk Aktiengesellschaft. Defendants admitted this fact in their answer. Plaintiffs' complaint alleged further that decedent's van, vehicle #223-2043-309, was designed, manufactured, and sold by the defendants. In their answer, however, defendants neither admitted nor denied this allegation. It was dependent on plaintiffs, therefore, to present some evidence that the Volkswagen manufacturers against which plaintiffs brought suit had some connection with decedent's automobile. This, plaintiffs failed to do. Without at least some evidence attributing decedent's vehicle to either of the manufacturers, the trial court could not allow the case to go to the jury.

Evidence was presented that decedent's vehicle was purchased from defendant Melton Motors.

Thus, plaintiffs did establish a prima facie case against Melton Motors. A directed verdict, therefore, should not have been granted in favor of that defendant.

Affirmed in part, reversed in part, and remanded for a new trial.